# STATE OF CONNECTICUT *v.* CHRISTIE MIKOLINSKI
## (SC 16275)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued March 16—officially released July 3, 2001

*Jeffrey D. Brownstein*, with whom, on the brief, was *Gregory A. Thompson*, for the appellant (defendant).

*Eileen McCarthy Geel*, assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The issue raised in this certified appeal is whether a sobriety checkpoint established for the purpose of detecting violations of General Statutes (Rev. to 1997) § 14-227a (a)[1] violates the provisions of article first, §§ 7[2] or 9,[3] of the constitution of Connecticut. The defendant, Christie Mikolinski, was charged with operating a motor vehicle while under the influence of intoxicating liquor in violation of § 14-227a. Before her trial to the court commenced, the defendant filed a motion to dismiss the information and a motion

---

[1] General Statutes (Rev. to 1997) § 14-227a (a) provides: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if he operates a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property (1) while under the influence of intoxicating liquor or any drug or both or (2) while the ratio of alcohol in the blood of such person is ten-hundredths of one per cent or more of alcohol, by weight."

[2] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[3] Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

to suppress, claiming that the checkpoint at which she was stopped violated her rights under the Connecticut constitution. The trial court denied those motions. Accordingly, the evidence gathered as a result of the stop of the defendant at the checkpoint was introduced against her at her ensuing trial. Following her conviction, the defendant appealed to the Appellate Court, which affirmed the judgment of the trial court; *State* v. *Mikolinski*, 56 Conn. App. 252, 262, 742 A.2d 1264 (1999); and, on the granting of certification,[4] the defendant appealed to this court.

The defendant claims that the Appellate Court improperly upheld the trial court's determination that the sobriety checkpoint instituted by the town of Southington did not violate her rights under article first, §§ 7 and 9, of our state constitution. We disagree and, accordingly, affirm the judgment of the Appellate Court.

The following facts, as stated by the Appellate Court, are relevant to this appeal. "Between 11 p.m. on May 23, 1997, and 3 a.m. on May 24, 1997, the Southington police department conducted a sobriety checkpoint of eastbound and westbound traffic in the area of 1199 Meriden-Waterbury Turnpike. Signs were posted in each direction alerting motorists to the checkpoint, and routes exiting the turnpike were available to motorists in each direction who chose not to enter the checkpoint.

"On May 24, 1997, at approximately 1:35 a.m., the [defendant] entered the checkpoint and stopped her vehicle. While the [defendant] was stopped, a police officer asked her a number of questions. . . . After the defendant admitted that she had been drinking alcohol,

---

[4] We granted certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the defendant's detention at a roadside sobriety checkpoint did not violate her rights under either article first, § 7, or article first, § 9, of the Connecticut constitution?" *State* v. *Mikolinski*, 252 Conn. 950, 748 A.2d 299 (2000).

the officer directed [her] to an adjacent parking lot where a second officer conducted a detailed investigation. Upon approaching the [defendant's] vehicle, the second officer smelled a strong odor of alcohol on the [defendant's] breath and noticed that her eyes were red and glassy. He administered several sobriety tests, all of which the [defendant] failed. The second officer then placed her under arrest for operating a motor vehicle while under the influence of [intoxicating] liquor in violation of . . . § 14-227a." (Citation omitted; internal quotation marks omitted.) Id., 254. Additional facts will be set forth as required.

The state does not dispute the fact that the initial stop of the defendant at the checkpoint constituted a seizure.[5] The state argues as a preliminary matter, however, that, because the defendant voluntarily entered the checkpoint, she cannot now claim that the seizure was unreasonable. Cf. *State v. Cobb*, 251 Conn. 285, 314–16, 743 A.2d 1 (1999), cert. denied, 531 U.S. 84, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). We need not decide whether the defendant voluntarily entered the checkpoint, however, because, even if we assume, arguendo, that this was not the case, she cannot prevail on her claim.

I

We first address the defendant's claim that Southington's sobriety checkpoint violated her rights under article first, § 7.[6] In *Michigan Dept. of State Police* v.

[5] Although the trial court did not find that the defendant had been seized at the checkpoint, we note that the detention of motorists at a checkpoint is a seizure under the United States constitution. *Michigan Dept. of State Police* v. *Sitz*, 496 U.S. 444, 450, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990) ("a Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint").

[6] The defendant does not challenge the legality of the sobriety testing that occurred after one of the officers at the checkpoint noticed that she had exhibited signs of intoxication.

*Sitz,* 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990), the United States Supreme Court held that the use of highway sobriety checkpoints, such as the one at issue in this appeal, is not prohibited under the fourth and fourteenth amendments to the United States constitution. See id., 455. We are not persuaded that article first, § 7, imposes greater restrictions upon the use of such checkpoints than that imposed by the fourth and fourteenth amendments to the United States constitution as interpreted by the United States Supreme Court in *Sitz.*

"It is well settled that we are not bound by the decisions of the United States Supreme Court in interpreting the contours of article first, [§ 7] . . . [and] that federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilkins,* 240 Conn. 489, 504, 692 A.2d 1233 (1997). "Moreover, we have held that [i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort . . . . In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. . . . [W]e have concluded in several cases that the state constitution provides broader protection of individual rights than does

the federal constitution."[7] (Citations omitted; internal quotation marks omitted.) *State* v. *DeFusco*, 224 Conn. 627, 632, 620 A.2d 746 (1993).

In determining whether the protections secured by article first, § 7, extend beyond those secured by the fourth amendment to the United States constitution, we consider several factors: (1) the text of the constitutional provision; (2) holdings and dicta of Connecticut appellate courts; (3) federal precedent; (4) sister state decisions; (5) historical aspects, including the historical constitutional setting and the debates of the framers; and (6) economic and sociological or policy considerations. E.g., *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992).

Our review of the text and history of article first, § 7, reveals nothing to indicate that it forbids the use of sobriety checkpoints. "The declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the federal bill of rights and the Virginia declaration of rights of 1776. . . . The search and seizure provision in our 1818 constitution, then article first, § 8, closely resembles the fourth amendment to the United States constitution. Although its enumeration was changed to article first, § 7, when the 1965 constitution incorporated article first, § 4, into article seventh, its language has not been altered since its original adoption." (Citation omitted; internal quotation marks omitted.) *State* v. *Diaz*, 226 Conn. 514, 533, 628 A.2d 567 (1993). The language of article first, § 7, which was based upon the fourth amendment, was adopted with little debate. See *Moore* v. *Ganim*, 233 Conn. 557, 600, 660 A.2d 742 (1995). Thus, the circumstances sur-

[7] E.g., *State* v. *Miller*, 227 Conn. 363, 386–87, 630 A.2d 1315 (1993) (warrantless search of automobile after police impoundment prohibited under article first, § 7); *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990) (rejecting good faith exception to exclusionary rule under article first, § 7).

rounding the adoption of article first, § 7, lend weight to the view that, in most cases, a practice permitted under the fourth amendment is permissible under article first, § 7.

We have stated that "[t]here can be no ready test for determining [the] reasonableness [of a search or seizure] other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails. . . . We judge the permissibility of a particular law enforcement practice by balancing its intrusion on the individual's interests against its promotion of legitimate state governmental interests, and examine the intrusion to determine whether it is the minimum search necessary under the circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilkins*, supra, 240 Conn. 503; see also *State* v. *Januszewski*, 182 Conn. 142, 148–49, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981).

In *Michigan Dept. of State Police* v. *Sitz*, supra, 496 U.S. 444, the court used the similar balancing test set forth in *Brown* v. *Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), and *United States* v. *Martinez-Fuerte*, 428 U.S. 543, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976), to weigh "the state's interest in preventing accidents caused by drunk drivers, the effectiveness of sobriety checkpoints in achieving that goal, and the level of intrusion on an individual's privacy caused by the checkpoints." (Internal quotation marks omitted.) *Michigan Dept. of State Police* v. *Sitz*, supra, 449. The court held that the sobriety checkpoint in that case was consistent with the fourth amendment, reasoning that "the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, [weigh] in favor of the state program." Id., 455. We conclude that this balancing test, which

is consistent with our precedent, provides the proper means by which to assess the validity of sobriety checkpoints under article first, § 7.

In applying this balancing test to the sobriety checkpoint at issue in the present appeal, the defendant does not dispute that the state has a significant interest in preventing motorists from driving while under the influence of alcohol. As the United States Supreme Court noted in *Sitz*, "[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." Id., 451.[8]

Against this interest, we balance the level of intrusion on the individual's privacy caused by a checkpoint. Although sobriety checkpoints may cause motorists a slight inconvenience, we conclude that, when sobriety checkpoints are operated properly, the intrusion on an individual's privacy is minimal. See id., 451 ("the measure of the intrusion on motorists stopped briefly at sobriety checkpoints . . . is slight").

The balancing test also requires an evaluation of "the degree to which the seizure advances the public interest . . . ." (Citation omitted; internal quotation marks omitted.) Id., 454. We agree with the United States Supreme Court that this inquiry is "not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." Id., 453. Rather, "the

---

[8] A National Highway Traffic Safety Administration report estimates that, in Connecticut, in 1998 alone, 6000 automobile accidents involved alcohol, resulting in 142 fatalities. The report also estimates that the average cost per mile driven of an accident involving a driver with a blood alcohol level of 0.10 or more is $5.20 per mile driven, as compared to ten cents per mile driven for an accident involving a driver with a blood alcohol level of 0.00. In short, "[w]e . . . recognize that a drunken driver is like a ticking time bomb." *Shore* v. *Stonington*, 187 Conn. 147, 162, 444 A.2d 1379 (1982) (*Peters, J.*, dissenting).

choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." Id., 453–54. We conclude that sobriety checkpoints further the public interest in reducing the number of alcohol related automobile accidents and resulting injuries, fatalities, and costs associated therewith.

The defendant, relying on principles outlined in *Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), argues that the officers operating the checkpoint were required to have a reasonable and articulable suspicion that the defendant was engaged in criminal activity before they detained her at the checkpoint. We are not persuaded by this argument.

It is true that "[a]pplications of *Terry* principles in the context of motor vehicle stops are . . . embodied in our state constitution. See, e.g., *State* v. *Torres*, 230 Conn. 372, 382–83, 645 A.2d 529 (1994) (reasonable articulable suspicion standard); *State* v. *Lamme*, [216 Conn. 172, 184, 579 A.2d 484 (1990)] (principles of *Terry* define when detention is clearly warranted by law under article first, § 9, of state constitution); *State* v. *Dukes*, [209 Conn. 98, 122, 547 A.2d 10 (1988)] (state constitution permits police to require occupants to step out of lawfully stopped motor vehicle); *State* v. *Anderson*, [24 Conn. App. 438, 441, 589 A.2d 374, cert. denied, 219 Conn. 903, 593 A.2d 130 (1991)] (state and federal constitutions permit brief investigatory stops based on reasonable and articulable suspicion)." *State* v. *Wilkins*, supra, 240 Conn. 508–509. None of the foregoing cases, however, involved stops made pursuant to neutral criteria. Rather, in each of the cases, the motorist was singled out by law enforcement officers based upon the officers' reasonable and articulable suspicion. The *Terry* standard, which is *predicated* upon police discretion, simply is incompatible with a sobriety checkpoint at which an

officer's discretion as to which cars to stop is *eliminated* by requiring the officer to stop all cars, or stop cars pursuant to other neutral criteria. As the court remarked in *Brown* v. *Texas*, supra, 443 U.S. 47, "[a] central concern in balancing [the public interest in law enforcement with individual liberty] . . . has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." Id., 51. We conclude that, just as the *Terry* standard protects an individual's freedom from arbitrary police conduct by requiring that a seizure "be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual"; id.; so does the requirement "that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Id.

The defendant argues that the checkpoint at issue in this case was not operated pursuant to a plan embodying neutral criteria that limited officers' discretion as to how individual drivers were to be treated. On the contrary, we agree with the trial court that the plan[9]

---

[9] The plan provided in relevant part: "On May 23, 1997 the Southington Police Department, will be conducting a Sobriety Checkpoint, for enforcement of Connecticut General Statute[s] § 14-227a Operation while under the influence of liquor or drug or while impaired by liquor. The sobriety checkpoint will be conducted on Meriden Waterbury Turnpike State of Connecticut route [number] 322, starting at 2300 hours on [May 23, 1997], and ending at 0300 hours on May 24, 1997.

"SOBRIETY CHECKPOINT LOCATION: In the area of 1199 Meriden Waterbury Turnpike.

"SET UP CHECKPOINT: The checkpoint will monitor both east and westbound traffic for Meriden Waterbury Turnpike. The checkpoint requires that every eastbound and westbound motor vehicle on Meriden Waterbury Turnpike be stopped. Two police officers will be assigned to traffic duty. Three police officers will be assigned as testing officers. There will be a processing officer who is assigned to Police headquarters and he will test all arrested subjects on the Intoxilyzer 5000.

"There will be signs set up prior to the checkpoint which will allow both eastbound and westbound traffic to turn around if they do not wish to travel through the checkpoint itself. If a vehicle turns around to avoid traveling

through the checkpoint it will not be stopped by any officer assigned to the checkpoint. A vehicle that attempts to avoid the checkpoint, and during such avoidance operates in a reckless manner, an officer will attempt to stop this vehicle for general public safety. The officer will speak with the operator about his or her operation, and take the enforcement action necessary.

"DESIGNATED TESTING AREA: Eastbound and westbound operators will be tested in the parking area of 1199 Meriden Waterbury Turnpike, which is a medium size plaza. This parking area has a covered side walk section and is flat.

"Sergeant William P. PALMIERI of the Southington Police Department will be the checkpoint supervisor.

"DUTIES AND ASSIGNMENTS OF OFFICERS:

"TRAFFIC OFFICERS: One officer will be assigned to eastbound traffic on Meriden Waterbury Turnpike. One officer will be assigned to westbound traffic on Meriden Waterbury Turnpike. Both traffic officers will stop their respective vehicles. The officers will introduce themselves explaining the nature of the sobriety checkpoint. The traffic officers will then ask three standard questions.

"1. Where are you coming from?

"2. Have you had anything to drink tonight?

"3. How much did you drink? (this would only be asked if the person stated they had consumed an alcoholic beverage).

"During this interview the traffic officers would be looking for clues which would indicate that the operator was under the influence such as slurred speech, smell of alcoholic beverage on breath, glassy eyes etc. If they detected the operator was possibly under the influence they would instruct the operator of the vehicle to pull into the designated testing area. At this point one of the testing officers would take over. If there is no detection of the operator being under the influence the officer will allow the operator to continue on their way.

"TESTING OFFICERS: These officers will conduct all field sobriety tests. The testing officers will administer the following field sobriety tests, in the same order as listed herein:

"1. The horizontal gaze nystagmus.

"2. The walk and turn.

"3. The one leg stand.

"If a testing officer has probable cause to believe the subject is intoxicated he/she will then place the subject under arrest, and transport them to Police Headquarters. If probable cause does not exist for the arrest of the tested subject they will be allowed to exit the testing area.

"TRANSPORT OFFICER: Will be any available officer. This officer will bring the subject to Police Headquarters and turn the subject over to the processing officer.

implemented by Southington police embodied neutral criteria in that it restricted officers' discretion as to which cars to stop and provided that all drivers were to be treated uniformly during the initial stop. The plan instructed officers to stop all cars and provided officers with three questions that they were to ask all drivers. If, after this initial encounter, an officer had reason to believe that the driver was driving while under the influence, the plan instructed the officer to direct the driver to a safe, off-street location, where another officer was to administer sobriety tests. The trial court found that the checkpoint was implemented "almost to the letter" of the operational plan.

Our conclusion that sobriety checkpoints operated pursuant to neutral criteria are permissible under article first, § 7, is in accord with the decisions of sister state courts upholding the implementation of sobriety checkpoints under their respective state constitutions. E.g., *Hagood* v. *Town Creek*, 628 So. 2d 1057, 1062 (Ala. Crim. App. 1993); *Mullinax* v. *State*, 327 Ark. 41, 47, 938 S.W.2d 801 (1997); *Ingersoll* v. *Palmer*, 43 Cal. 3d 1321, 1325, 743 P.2d 1299, 241 Cal. Rptr. 42 (1987); *People* v. *Rister*, 803 P.2d 483, 490–91 (Colo. 1990); *State* v. *Loyd*, 530 N.W.2d 708, 713 (Iowa 1995); *Little* v. *State*, 300 Md.

"PROCESSING OFFICER: Will be Officer DOERFLER and he will process all necessary paper work and test all subjects on the Intoxilyzer 5000.

"ALTERNATIVE CHECKPOINT ROUTE: Putnam Place will allow eastbound vehicles an alternative route other than traveling through the checkpoint. Birch Drive will allow westbound vehicles an alterative route other than traveling through the checkpoint. There will be signs posted prior to these streets warning SOBRIETY CHECKPOINT AHEAD. The Putnam Place warning sign was located approximately [one] tenth of [one] mile west of the checkpoint. The [B]irch Drive warning sign was located approximately [one] and one half tenths of [one] mile east of the checkpoint.

"This operational Plan will allow for changes should the need arise, any changes to this plan will be made by [Sergeant Palmieri], and all officers working the checkpoint will be advised. [Sergeant Palmieri] will then prepare a supplemental case report as to what the change was and why it was needed."

485, 504, 479 A.2d 903 (1984); *State* v. *Welch*, 755 S.W.2d 624, 632–33 (Mo. App. 1988); *Bismarck* v. *Uhden*, 513 N.W.2d 373, 378–79 (N.D. 1994); *State* v. *Bauer*, 99 Ohio App. 3d 505, 513–14, 651 N.E.2d 46 (1994); *Commonwealth* v. *Blouse*, 531 Pa. 167, 173–74, 611 A.2d 1177 (1992); *State* v. *Downey*, 945 S.W.2d 102, 104 (Tenn. 1997); *Carte* v. *Cline*, 194 W. Va. 233, 238, 460 S.E.2d 48 (1995).

## II

The defendant next argues that the sobriety checkpoint violated her rights under article first, § 9. We disagree.

Article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law." "[W]e have generally characterized article first, § 9, as one of our state constitutional provisions guaranteeing due process of law. See, e.g., *State* v. *Marra*, 195 Conn. 421, 425, 489 A.2d 350 (1985); *State* v. *Castonguay*, 194 Conn. 416, 420, 481 A.2d 56 (1984); *Parks* v. *Bourbeau*, 193 Conn. 270, 278 n.8, 477 A.2d 636 (1984)." *State* v. *Lamme*, 216 Conn. 172, 177, 579 A.2d 484 (1990).

In *Lamme*, the defendant challenged the administration of roadside sobriety tests after having been stopped for a motor vehicle infraction. See id., 174. The defendant argued that article first, § 9, prohibits a police officer from detaining an individual unless the officer has probable cause to make an arrest. Id., 176. We rejected this argument, concluding that "the specific content appropriately to be assigned to the phrase 'clearly warranted by law' depends on the particular liberty interest that is at stake." Id., 178. We stated that "[t]he historical roots of 'except in cases clearly warranted by law' appear . . . to provide protection for personal freedom through a blend of statutory and constitutional rights that, like the text of . . . article

first, § 9, incorporates no single constitutional standard." Id., 179. We held that "the principles underlying constitutionally permissible *Terry* stops . . . define when detentions are 'clearly warranted by law' under article first, § 9." (Citations omitted.) Id., 184. We then "balanc[ed] the need to search [or seize] against the invasion which the search [or seizure] entails." (Internal quotation marks omitted.) *Terry* v. *Ohio*, supra, 392 U.S. 21. "[In] [b]alancing the circumscribed nature of a *Terry* stop intrusion against the serious risks of criminal behavior, especially in the context of the risks associated with driving while under the influence of intoxicating liquor, we [concluded] that the defendant's brief detention [by police in order to administer the roadside sobriety tests] did not violate his due process rights." *State* v. *Lamme*, supra, 216 Conn. 184.

Thus, in defining the contours of article first, § 9, our first task is to identify the particular liberty interest at stake. In the present case, as in *Lamme*, the protected liberty interest is the individual's right to be free from unreasonable police detention while driving a car. Because of the similarity of the liberty interest in the present case with that in *Lamme*, we conclude that the balancing test that was applied in *Lamme* appropriately guides our analysis of the defendant's claim. See id.

In the present case, the defendant does not dispute that "[t]he state has a vital interest in keeping intoxicated drivers off the roads and highways"; *State* v. *Lamme*, 19 Conn. App. 594, 599, 563 A.2d 1372 (1989), aff'd, 216 Conn. 172, 579 A.2d 484 (1990); and we have concluded in our discussion of article first, § 7; see part I of this opinion; that this vital interest outweighs the intrusiveness of the checkpoint.

The defendant claims that her right to due process under article first, § 9, was violated "because [a sobriety checkpoint] permitting 'suspicionless' seizures [is] not

expressly authorized by any statutory or administrative scheme and is not police activity that was authorized under common law." Nothing in the text or the history of article first, § 9, however, requires common-law, statutory or administrative authorization to conduct an investigatory stop of a motorist. In *State* v. *Lamme,* supra, 216 Conn. 185, we concluded, as a matter of state constitutional law, that *Terry* stops, which are not authorized by any statute or regulation, are permissible under article first, § 9. We stated that "[o]ur appraisal of the due process contours of article first, § 9, leads us to conclude that the principles of fundamental fairness that are the hallmark of due process permit a brief investigatory detention, even in the absence of probable cause, if the police have a reasonable and articulable suspicion that a person has committed or is about to commit a crime." Id., 184. In light of the balance of interests in the present appeal, we are persuaded that a brief investigatory detention at a sobriety checkpoint that is planned and operated pursuant to neutral criteria is consistent with the due process provisions of article first, § 9.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.