STATE OF CONNECTICUT *v.* EVARISTO GONZALEZ, FKA WILLIAM SANCHEZ, FKA FELIX APONTE[1] (AC 21597)

Foti, Dranginis and Flynn, Js.

---

[1] The defendant's legal identity is Evaristo Gonzalez. He has, nonetheless, used various aliases, including Felix Aponte (see part II). As a condition of probation in this matter, the court ordered that the defendant refrain from using aliases or names other than his birth name in the future. He was prosecuted in this matter under the name William Sanchez.

Argued October 24, 2002—officially released January 21, 2003

*David B. Rozwaski*, special public defender, for the appellant (defendant).

*Peter D. Fearon*, certified legal intern, with whom were *Rita M. Shair*, senior assistant state's attorney, and, on the brief, *James E. Thomas*, state's attorney, and *Victor Carlucci, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of possession of narcotics in violation of General Statutes § 21a-279 (a), conspiracy to possess narcotics in violation of General Statutes §§ 53a-48 and 21a-279 (a), possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b), conspiracy to possess narcotics with intent to sell in violation of General Statutes §§ 53a-48 and 21a-278 (b), operating a drug factory in violation of General Statutes § 21a-277 (c), and conspiracy to operate a drug factory in violation of General Statutes §§ 53a-48 and 21a-277 (c). On appeal, the defendant claims that (1) the trial court improperly denied his motions to suppress his inculpatory statements, (2) there was insufficient evidence to support his conviction and (3) the court violated his right against double jeopardy by improperly sentencing him on all three counts of conspiracy. Additionally, the defendant claimed at oral argument, and the state conceded, that the court further violated his right against double jeopardy by improperly sentencing him on both the possession and the possession with intent to sell counts. We affirm in part the judgment of the trial court, but reverse it as to the sentence for multiple conspiracies and for both possession and possession with intent to sell.

The jury reasonably could have found the following facts. On October 13, 1999, Detective Ramon Baez of the vice and narcotics unit of the Hartford police depart-

ment received information from a confidential informant that the Grand Chalet Hotel in Hartford was being used by a heroin supplier as a supply and packaging outlet. The informant also gave Baez information concerning an automobile driven by Orlando Ortiz, the codefendant in this case. Baez, with the use of an informant, then sought to conduct a "controlled buy" of heroin in room 271 of the hotel. Approximately ten or fifteen minutes after Baez and his partner, Detective Patricia Beaudin, escorted this informant to the hotel, the informant exited the hotel accompanied by Ortiz. The informant told Baez and Beaudin that he had made the buy and turned over nine bags of heroin. Baez later interviewed an employee of the hotel and learned that the room was rented to Felix Aponte of 41 Bond Street, Hartford.

Baez and Beaudin obtained a search warrant for room 271 of the hotel. Baez, Beaudin and two other officers, Sergeant Arvid Leftwich and Detective Anthony Martinez, searched the unoccupied room and found a duffle bag. The duffle bag contained 555 bags of heroin packaged for sale together with an additional twenty-three grams of raw heroin in pellet form, scales, packaging material and other drug paraphernalia. Police also seized from the room quinine and procaine cutting agents, coffee grinders to grind the pure heroin, packaging bags, heat sealing equipment, lactose, mortar and pestle to break down the heroin, strainers to break down the coarser heroin, and various other pieces of drug processing and packaging equipment.

Leftwich and Martinez left the hotel and went to the Bond Street address. On the basis of intelligence information given to them by Baez, they were searching for a short Hispanic male, with a light complexion and a bald head, who went by the name of "Willie." Leftwich and Martinez soon notified Baez that a suspect, fitting Willie's description, had been apprehended, and Baez

and Beaudin went to the Bond Street address, took the suspect into custody and transported him to the Hartford police department. Once at the police station, Baez learned that the defendant, Willie, also known as William Sanchez, whom he had in custody, and Felix Aponte were one and the same person.[2]

Baez informed the defendant of his *Miranda*[3] rights by reading aloud the police department's waiver form.[4] Baez then gave the waiver form to the defendant and instructed him to read and initial the first five lines. Baez testified that he saw the defendant initial the waiver form, but the defendant, then, refused to sign

---

[2] The defendant told Baez that he used the name Felix Aponte on the hotel registration because he did not want to ruin his own name. He did not specify which of the other names he used that caused this concern.

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] The waiver form is preprinted and contains, inter alia, the following: "Before I am interviewed or asked any questions, I am aware that I must be advised of my rights and I must fully understand those rights:

"1. I HAVE BEEN ADVISED AND KNOW THAT I HAVE A RIGHT TO REMAIN SILENT

"2. I HAVE BEEN ADVISED AND KNOW THAT ANYTHING I SAY CAN BE USED AGAINST ME IN A COURT OF LAW

"3. I HAVE BEEN ADVISED AND KNOW THAT I HAVE A RIGHT TO AN ATTORNEY, AND I KNOW THAT THE ATTORNEY CAN BE WITH ME WHILE I AM BEING QUESTIONED BY THE POLICE

"4. I HAVE BEEN ADVISED AND KNOW THAT IF I CANNOT AFFORD AN ATTORNEY, ONE CAN BE APPOINTED FOR ME, AND I MAY HAVE HIM WITH ME BEFORE ANSWERING ANY QUESTIONS

"5. I HAVE BEEN ADVISED AND I KNOW THAT I CAN REFUSE TO ANSWER ANY QUESTIONS, OR, I MAY STOP ANSWERING QUESTIONS AT ANY TIME I SO DESIRE

"WAIVER:

"6. NOW THAT I HAVE BEEN ADVISED OF MY RIGHTS AND THAT I FULLY UNDERSTAND THESE RIGHTS, I AM WILLING TO BE INTER-VIEWED AND ANSWER QUESTIONS. I *DO NOT* WISH THE PRESENCE OF ANY ATTORNEY AT THIS TIME. I AM WAIVING THESE RIGHTS FREELY AND VOLUNTARILY, WITHOUT ANY FEAR, THREAT, OR PROM-ISES BEING MADE TO ME." (Emphasis in original.)

The waiver form, then, has a signature line, a date and time line, and a signature line for a witness.

it, stating that he did not want to sign any documents. Although the defendant had placed his initials on the first five lines, he then crossed out his initials on the first two lines and apparently reinitialed them after having crossed them out. Baez testified that he did not notice the defendant cross out his initials on the waiver form. Despite the defendant's statement that he did not want to sign any documents, the defendant did sign a money receipt for the $338 that was seized from him upon his arrest.

While the defendant was being interviewed, two members of the Hartford police department arrested Ortiz. When searched, Ortiz was in possession of the room key for room 271 of the hotel.

On January 20, 2000, Baez and Beaudin met with Jenny Vosney, a front desk clerk of the hotel, and showed her an array of eight photographs. She identified the defendant's photograph from that array and stated that he was the person she knew as Felix Aponte, the renter of room 271 from October 10 through October 15, 1999. Vosney also identified the defendant in court.

I

We first address the defendant's claim that the trial court improperly denied his repeated motions to suppress the statements he made to Baez during his interrogation. The defendant argues that the court should have granted his motion to suppress because he did not voluntarily, knowingly and intelligently waive his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He contends that the manner in which he was interviewed, alone in a room with Baez and the duffle bag full of narcotics related evidence, created a coercive atmosphere. Specifically, he argues that "the crossing out of his initials on the first two lines [of the waiver form] and his refusal to sign any statement, along with the way in which the [police]

interview was conducted, does not satisfy the waiver requirement. As such, his statements should not have been admissible during the course of the trial." We disagree.

"Pursuant to the fifth and fourteenth amendments to the United States constitution, a statement made by a defendant during custodial interrogation is admissible only upon proof that he . . . waived his rights [under *Miranda*] . . . . To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Williams*, 65 Conn. App. 59, 72–73, 782 A.2d 149, cert. denied, 258 Conn. 923, 782 A.2d 1251 (2001).

"Furthermore, [although a] defendant's express written and oral waiver is strong proof that the waiver is valid"; (internal quotation marks omitted) id., 73; the failure to sign a form or give a written statement does "not necessarily indicate an involuntary waiver." *State* v. *Whitaker*, 215 Conn. 739, 755, 578 A.2d 1031 (1990); see also *State* v. *Shifflett*, 199 Conn. 718, 732–34, 508 A.2d 748 (1986) (despite refusal to sign waiver form, voluntary waiver found); *State* v. *Harris*, 188 Conn. 574, 578, 452 A.2d 634 (1982) (defendant's incriminating oral admissions admitted despite refusal to sign written waiver and unwillingness to make written statement), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed.

2d 354 (1983); *State* v. *Derrico*, 181 Conn. 151, 154–56, 434 A.2d 356 (defendant, after initial hesitancy to sign waiver form, mutilated it after giving confession), cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); *State* v. *Frazier*, 185 Conn. 211, 220–22, 440 A.2d 916 (1981) (defendant agreed to make oral, but not written statement to police), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982); *State* v. *Pecoraro*, 198 Conn. 203, 207–209, 502 A.2d 396 (1985) (waiver implied from defendant's exercise of right to cut off further questioning).

In this case, the court's conclusion that the defendant waived his *Miranda* rights voluntarily, knowingly and intelligently is supported by substantial evidence. Baez testified that he followed standard procedures when obtaining the waiver from the defendant. He asked the defendant if he wished to speak about the investigation, and the defendant answered in the affirmative. Baez read the waiver form to the defendant and went over it with him. Baez also gave the form to the defendant to read himself. The defendant initialed the form, but refused to sign it. Baez signed the form on the witness line. Beaudin was present and witnessed this advisement. Beaudin, however, was not present when Baez questioned the defendant.

Baez showed the defendant the evidence that was seized from room 271 and told him that Ortiz also had been arrested. Initially, the defendant was cooperative. When the defendant realized that he could not negotiate his release with Baez in exchange for information, he refused to be interviewed further. He then was transferred to the booking area.

Although the defendant stresses that he did not sign his name on the signature line of the waiver form, and he crossed out his initials before reinitialing the form on the first two lines, he does not deny that he did, in

fact, initial the first five lines of the form. These initials along with the circumstances surrounding the defendant's statements, are strong proof that the waiver was valid. See id. Additionally, the record is devoid of evidence that Baez or any other officer employed threats, promises or deceptive measures to obtain the defendant's initials on the waiver form. Rather, the evidence demonstrates that the defendant originally initialed the waiver form and cooperated with the police in an effort to secure his release. Nevertheless, a written waiver is not required. See *State* v. *Whitaker*, supra, 215 Conn. 755. When the defendant's efforts to negotiate his release failed, he refused to cooperate further, and the interview was concluded. Accordingly, we reject the defendant's claim and conclude that the court properly determined that he knowingly, intelligently and voluntarily waived his *Miranda* rights.

The second part of the defendant's claim alleges that his statements to Baez should not have been admitted because his interview was conducted in a coercive atmosphere. Specifically, the defendant argues that "[t]o have an interrogation in a police station [one-on-one] with a pile of evidence and the threat of significant exposure creates a coercive atmosphere." We find no merit to the defendant's claim.

The evidence demonstrated that the defendant voluntarily discussed with Baez the evidence seized from the hotel. Initially, he was cooperative. He told Baez that he was a bigger dealer than Ortiz and that he could get much more heroin than was seized. He asked Baez if he would let him go in exchange for more narcotics and information on his supplier. Upon being told that Baez would not make such a deal and was documenting the defendant's responses, the defendant refused to continue with the interview.

After reviewing the record, we find no support for the defendant's claim that Baez' act of conducting a

custodial interview one on one, with evidence in view, was coercive and thereby violated the defendant's constitutional rights. The defendant presents no evidence that this interview was conducted in a coercive manner. The court found, and we agree, that the defendant was aware of his rights and, in fact, exercised those rights when he discontinued the interview and refused to sign a statement. The defendant's conduct in stopping the interview, upon realizing that no deal would be made, and his refusal to sign a statement demonstrate not only that he understood his *Miranda* rights but also that he knew how to exercise those rights. His conduct in initially agreeing to an interview, printing his initials on the first five lines of the waiver form, actively participating in an interview and subsequently bringing to an end that interview demonstrate a valid waiver and exercise of those constitutional rights.

Accordingly, we reject the defendant's claim that the court improperly denied his motions to suppress his statements to the police.

II

The defendant next claims that there was insufficient evidence to support his conviction of possession of narcotics, possession with intent to sell and operating a drug factory. The defendant further argues that evidence of a conspiracy was also lacking in this matter. We are not persuaded.

"The standard of review of an insufficiency claim is twofold. We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a

reasonable doubt." (Internal quotation marks omitted.) *State* v. *Mikolinski*, 56 Conn. App. 252, 260–61, 742 A.2d 1264 (1999), aff'd, 256 Conn. 543, 775 A.2d 274 (2001).

A

The defendant argues that there was insufficient evidence to support his conviction on the charges of possession of narcotics, possession with intent to sell and operating a drug factory. Specifically, he argues that "because [he] was never involved in any transactions, was not present at the time of the search, there was no forensic evidence tying him to the seized evidence, he had no drug contraband on him or other items on him when he was arrested, there was insufficient evidence to sustain the drug convictions in this matter."

"In order to prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . Where, as here, the [narcotics were] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . One factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control over them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Citations omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 225, 733 A.2d 156 (1999).

Although there was no physical evidence placing the defendant at the hotel at the time the heroin and other narcotics related items were seized, the state presented

sufficient evidence to support the inference that the defendant knew of the presence of the narcotics and the related processing and packaging equipment and exercised control over them.

First, the evidence demonstrates that it was the defendant who had rented room 271 at the time of the drug seizure on October 14, 1999. Various employees of the hotel stated that room 271 was rented to Felix Aponte. During his interview, the defendant admitted to Baez that he had rented room 271 under the name Felix Aponte to avoid tainting his own name. Vosney, one of the front desk clerks at the hotel, told Baez that she saw the defendant going into and out of room 271. She also testified that the defendant was renting room 271 at the time of the narcotics seizure, was a regular at the hotel and had attained VIP status.[5] Further, she identified the defendant as Felix Aponte from a photograph in an array. She also identified the defendant at trial.

Baez explained to the jury that drug factory dealers typically do not use their homes to package drugs because they do not want their homes located by the police, customers or competitors. They often use locations that are close to home, however. The defendant's Bond Street home was less than one mile from the hotel.

There were also many other incriminating statements or circumstances that tend to buttress the inference of constructive possession of the heroin and other narcotics related items. See id. The controlled buy of heroin was made in the defendant's room, and the duffle bag containing a substantial amount of heroin was seized from that room, along with various sorts of drug processing and packaging equipment. Intelligence information led the police to a short Hispanic male, with a light

---

[5] Vosney testified that VIP status affords certain privileges, such as late check-outs, at a cost of $10 per year.

complexion and a bald head, who went by the name of "Willie." Leftwich and Martinez identified the defendant as fitting this description when they found him at the Bond Street address listed on the hotel registration form.

When interviewed by Baez, the defendant did not deny that the heroin and other processing and packaging equipment were his; rather, he insinuated that they were his. When asked where he had obtained the narcotics, he told Baez that he would give him the name of his supplier in exchange for his release. The defendant then boasted about his ability to obtain even larger quantities of narcotics. He also boasted that he was a bigger dealer than Ortiz. Additionally, although the defendant had not earned any wages since some time prior to the end of 1996, $338 was seized from him upon his arrest.

We do not find it unreasonable for the jury to have concluded that the defendant was in constructive possession of the heroin and other processing and packaging equipment based on the reasonable inferences drawn from the evidence presented. "It is well settled that in reviewing a defendant's challenge to a verdict based on insufficient evidence, we defer to the jury. . . . We do not sit as [an additional] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." (Citation omitted; internal quotation marks omitted.) *State* v. *Young*, 56 Conn. App. 831, 835, 746 A.2d 795, cert. denied, 253 Conn. 904, 753 A.2d 939 (2000). "The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Berger*, supra, 249 Conn. 224.

Construing the evidence and the reasonable inferences drawn therefrom in the light most favorable to sustaining the jury's verdict, as we must, we conclude that the evidence was sufficient to support the guilty verdict on the charges of possession of narcotics, possession of narcotics with intent to sell and operating a drug factory.

## B

The defendant next claims that there was insufficient evidence to convict him on the conspiracy counts. He argues that "there was no evidence submitted during the trial to establish a conspiracy between Mr. Ortiz and the [defendant]. No intent or meeting of minds was offered . . . ."

"To establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Further, the prosecution must show both that the conspirators intended to agree and that they intended to commit the elements of the underlying offense." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 657–58, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). "The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." (Internal quotation marks omitted.) *State* v. *Berger*, supra, 249 Conn. 226–27.

"Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that

the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . Indeed, a conspiracy can be inferred from the conduct of the accused . . . and his coconspirator, as well as from the circumstances presented as evidence in the case." (Citations omitted; internal quotation marks omitted.) Id., 227.

The evidence demonstrated that the defendant rented room 271 of the hotel under a fictitious name and that Ortiz possessed a key to that room. The hotel, where the defendant was a well known VIP, was less than one mile from his home address. He used the name Felix Aponte in his dealing with the hotel to avoid ruining his own name. After making a controlled buy of nine bags of heroin from room 271, the confidential informant exited the hotel in the company of Ortiz. Soon thereafter, the police executed a search warrant for the room and seized over 550 bags of heroin packaged for sale, as well as uncut heroin, packaging agents and processing equipment. The defendant told the police that he was a bigger dealer than Ortiz and could obtain much larger quantities of narcotics.

It was not necessary for the state to prove that the defendant and Ortiz had drawn up a formal agreement to conspire. See id. The conspiracy here reasonably can be inferred from the conduct of the defendant and Ortiz, as well as from the circumstances presented as evidence in the case. See id. This evidence and the reasonable inferences drawn therefrom was sufficient to permit the jury to make a finding that the defendant and Ortiz had engaged in a mutual plan to possess heroin, to possess heroin with the intent to sell and to operate a drug factory. Accordingly, the defendant's claim of evidentiary insufficiency is without merit.

### III

We next address the defendant's claim that the court violated his right against double jeopardy by improperly

sentencing him on all three counts of conspiracy and on both the possession of narcotics count and the possession of narcotics with intent to sell count.[6] The state concedes that the defendant's conviction for multiple offenses of conspiracy arising from the same set of facts should be combined and the lesser sentences vacated. It also concedes that the defendant's conviction of possession of narcotics and possession of narcotics with intent to sell should be combined and the lesser sentence vacated. We agree.

"The double jeopardy clause of the fifth amendment to the United States constitution, which is applicable to the states through the due process clause of the fourteenth amendment, protects against multiple punishments for the same offense in a single trial. . . . [Our Supreme Court has] also held that the due process guarantees of article first, § 9, of the Connecticut constitution include protection against double jeopardy." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 288, 780 A.2d 53 (2001). "This constitutional guarantee serves three separate functions: (1) It protects against a second prosecution for the same offense after acquittal. [2] It protects against a second prosecution for the same offense after conviction. [3] And it protects against multiple punishments for the same offense [in a single trial]." (Internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 360–61, 796 A.2d 1118 (2002); see also *State* v. *Chicano*, 216 Conn. 699, 703, 584 A.2d 425 (1990) (defendant's rights under double jeopardy clause violated where conviction and sentence for both felony murder and manslaughter in first degree were based on single homicide), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); *State* v. *John*, 210 Conn. 652,

---

[6] That claimed violation of the defendant's right against double jeopardy was not preserved at trial. Nonetheless, we find the claim reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

693–97, 557 A.2d 93 (same), cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). The defendant's claim implicates the last of these functions.

"Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. . . . The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute. . . . For such a violation, only the single penalty prescribed by the statute can be imposed." (Internal quotation marks omitted.) *State* v. *Vasquez*, 66 Conn. App. 118, 127, 783 A.2d 1183, cert. denied, 258 Conn. 941, 786 A.2d 428 (2001).

The defendant was convicted and sentenced on three separate conspiracy offenses arising from the same set of facts. As such, his multiple sentences cannot stand. See id. The proper remedy in this case is to combine the defendant's conviction of multiple conspiracies and to vacate the lesser sentences.

We now address the defendant's claim that the court improperly sentenced him both for possession of narcotics and for possession of narcotics with intent to sell. As we stated in *State* v. *Cavanaugh*, 23 Conn. App. 667, 680, 583 A.2d 1311 (1990), cert. denied, 220 Conn. 930, 598 A.2d 1100 (1991), double jeopardy precludes the trial court from sentencing a defendant for possession and possession with intent to sell when the violations resulted from the same act or transaction, because possession is a lesser offense included in the offense of possession with intent to sell.

Our Supreme Court, in *State* v. *Chicano*, supra, 216 Conn. 723, explained that when a defendant is convicted of both greater and lesser offenses arising out of a single

transaction, the trial court must merge or combine the conviction on the lesser offense with the conviction on the greater offense. It is improper to sentence the defendant on both the greater and lesser offense. Id.

In this case, the defendant properly seeks to have his sentence for possession of narcotics under § 21a-279 (a) vacated and that conviction merged with the conviction for possession of narcotics with intent to sell under § 21a-278 (b). Because possession of narcotics is a lesser offense included within the offense of possession of narcotics with intent to sell and those convictions arose out of the same transaction or act, multiple punishments are improper. See id., 714; *State* v. *Cavanaugh*, supra, 23 Conn. App. 680.

The judgment is reversed in part and the case is remanded with direction to merge the conviction on the multiple conspiracy offenses in counts two, four and six, to merge the conviction of possession of narcotics with the conviction of possession of narcotics with intent to sell in counts one and three, and to resentence the defendant. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.