STATE OF CONNECTICUT *v.* RICHARD COMOLLO*

Superior Court, Geographical Area No. 14 at Hartford
File No. MV-10-0461805-S

Memorandum filed June 28, 2011

*Proceedings*

*Donald G. Leis, Jr.,* for the defendant.

*Robert Diaz,* assistant state's attorney, for the state.

---

* Affirmed. *State* v. *Comollo,* 141 Conn. App. 295, 60 A.3d 1057 (2013).

CARBONNEAU, J. From the highly credible testimony and the persuasive exhibits presented at a hearing conducted over parts of two days, the court finds the following facts.

The Hartford Police Department's ("HPD") Traffic Division conducted a roadside sobriety checkpoint ("checkpoint") from Thursday, May 20, 2010, at 7 p.m. to Friday, May 21, 2010, at 3 a.m. according to a pre-established "Organizational Plan" ("Plan"; Defendant's Exhibit 2). Most, if not all aspects of this Plan had been employed by HPD in earlier checkpoints it had conducted. At that time Captain William Long was Lieutenant in command of HPD's Traffic Division. He cleared the date of the checkpoint with the State Department of Transportation. He selected a location on Brainard Road in Hartford because that highway is highly traveled, increasing the possibility of interacting with anyone under the influence of drugs or alcohol. The Lieutenant also considered the lighting at the site and other factors present that could affect pedestrians', drivers' and officers' safety during the checkpoint. He briefed the officers who were to man the site on all facets of the Plan at a precheckpoint meeting.

Sergeant Christine Mertes was the HPD's Public Information Officer ("PIO") at the time of the checkpoint. Her duties as PIO included dealing with the media, issuing press releases and handling inquiries from the public. Sergeant Mertes testified that the unwritten policy and custom of the Department was to issue press releases concerning sobriety checkpoints twenty-four to forty-eight hours in advance of the operation. She prepared a press release about the May 20, 2010 checkpoint from a template used many times previously by HPD, changing only the date, time and place. (See State's Exhibit 1.) She issued the completed release on May 18, 2010, at 2:15 p.m. to a list of over 2000 recipients, including the Associated Press, the Hartford

Courant, the Travelers Insurance Company, local radio and television stations as well as individual reporters and bloggers. The release appeared on the HPD website, Facebook and other social media.

Sergeant Andrew Lawrence was one of eight officers at the checkpoint. He testified that the Operational Plan called for the officers to be in full uniform and to place signs so that motorists would be alerted to the impending checkpoint and allowed to avoid it by turning off of Brainard Road prior to being stopped. The Plan dictated that all cars were to be stopped unless a buildup of traffic caused safety issues. Only then would cars be allowed to pass through the checkpoint without being questioned. According to the Plan, all detained, after being reassured of the routine nature of the stop, would be asked the same three initial questions: Where are you coming from? Have you been drinking? If so, how much? The Sergeant testified that this process lasted about thirty seconds for most travelers. Officers set apart an area "coned off" from the travel lanes to more closely examine any driver suspected of impaired operation in complete safety. Such further investigation obviously detained a driver for a few more minutes.

Sergeant Lawrence encountered the defendant, Richard Comollo, at 9:05 p.m. He asked the defendant the required questions, determined that there was cause to inquire further, directed the defendant to the coned off safety area and ultimately arrested him for operating under the influence. The defendant now asserts in his motion that the HPD's failure to publish notice to the public at least three days prior to the time of the checkpoint requires the court to suppress all evidence gathered against him at the checkpoint.

## ANALYSIS

The Connecticut Supreme Court concluded in *State* v. *Mikolinski*, 256 Conn. 543, 551, 775 A.2d 274 (2001),

that "sobriety checkpoints further the public interest in reducing the number of alcohol related automobile accidents and resulting injuries, fatalities, and costs associated therewith." The court based its decision on *Michigan Dept. of State Police* v. *Sitz*, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990), adopting a balancing test "to weigh 'the state's interest in preventing accidents caused by drunk drivers, the effectiveness of sobriety checkpoints in achieving that goal, and the level of intrusion on an individual's privacy caused by the checkpoints.' " *State* v. *Mikolinski*, supra, 549, quoting *Michigan Dept. of State Police* v. *Sitz*, supra, 449.

Applying this test in the context of article first, § 7, of the Connecticut constitution, the *Mikolinski* court decided that "when sobriety checkpoints are operated properly, the intrusion on an individual's privacy is minimal."[2] *State* v. *Mikolinski*, supra, 256 Conn. 550, citing *Michigan Dept. of State Police* v. *Sitz*, supra, 496 U.S. 451. A sobriety checkpoint is operated properly when it is "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." (Internal quotation marks omitted.) *State* v. *Mikolinski*, supra, 552, quoting *Brown* v. *Texas*, 443 U.S. 47, 51, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979).

*State* v. *Leighton*, 551 A.2d 116, 118 (Me. 1988), assembled from a number of courts the following neutral criteria for use in evaluating the reasonableness of a sobriety checkpoint: "(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration

---

[2] The Appellate Court extended this constitutional analysis to article first, § 9, of the state constitution in *State* v. *Boisvert*, 40 Conn. App. 420, 428 n.8, 671 A.2d 834, cert. denied, 237 Conn. 903, 674 A.2d 1332 (1996). Citing *State* v. *Lamme*, 216 Conn. 172, 579 A.2d 484 (1990), the *Boisvert* court held that "a brief investigatory detention, even without probable cause, passes state constitutional muster." *State* v. *Boisvert*, supra, 435 n.5.

of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test." (Internal quotation marks omitted.)

The sheer number of these different neutral criteria underscores that no single consideration necessarily trumps any other. Weighing all factors together in a cohesive context is the proper measure of the reasonableness of a roadside sobriety checkpoint. No single criteria of the operational plan for a sobriety checkpoint can be taken out of context and used as a shield by an accused. The neutral criteria are first and foremost for the protection and safety of the public; second, they provide the basis for an investigative stop that would otherwise require a reasonable, articulable suspicion on the part of the police.[3]

Advance notice to the public, for example, is only one of many factors to evaluate when determining the validity of sobriety checkpoints. Id., 119. Indeed, the court in *Leighton* observed that "while advance publicity may help to deter drivers from driving while intoxicated and may reduce motorist anxiety on being stopped, it is not constitutionally required." Id., citing *Commonwealth* v. *McGeoghegan*, 389 Mass. 137, 143, 449 N.E.2d 349 (1983); accord *State* v. *Boisvert*, 40 Conn. App. 420, 428 n.8, 671 A.2d 834, cert. denied, 237 Conn. 903, 674 A.2d 1332 (1996).

---

[3] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

In addition, no Connecticut case has ever required strict and absolute adherence to each and every criterion set out in the operational plan for a sobriety checkpoint. *State* v. *Boisvert,* supra, 40 Conn. App. 428. Instead, our courts have required that police conduct their sobriety checkpoints in *substantial* compliance with all *substantial* aspects of their operational plans. See *State* v. *Mikolinski,* supra, 256 Conn. 554 (trial court finds checkpoint implemented by police *almost to the letter* of the operational plan); *State* v. *Fongemie,* Superior Court, judicial district of New Britain, geographical area number seventeen, Docket No. MV-04-211708 (November 16, 2005) (*Cronan, J.*) (no signs announcing checkpoint does not give rise to a claim of noncompliance).

In the instant case according to the evidence, the HPD conducted their May 20, 2010 sobriety checkpoint on Brainard Road in flawless compliance with their Operational Plan and long-standing policies and procedures regarding such. The Plan took into consideration each and every of the *Leighton* criteria cited earlier. Lieutenant Long chose the date, time and place of the checkpoint in conjunction with the State Department of Transportation and others in HPD's Traffic Division. He considered all safety aspects of the proposed plan and informed all members of the checkpoint team of these terms and conditions in advance of the date of the checkpoint. PIO Mertes drafted, completed and distributed a press release to over 2000 recipients, media and Internet outlets of all variety, and she did so fifty-two hours and forty-five minutes prior to the start of the checkpoint in accordance with HPD's unwritten policy. Sergeant Lawrence and his team executed the checkpoint according to neutral criteria as planned by Lieutenant Long, including adequate lighting and signage, "escape routes," coned off safety areas and the same initial questions to all drivers that minimized their

detention. As Sergeant Lawrence testified, there simply is no better proactive way for the police to combat the scourge of drunken driving on our highways.

The "set criteria and procedures" that counsel for the defendant seeks in his brief are set forth in the written operational plan of the HPD for the checkpoint in question. Neither statute nor case law mandates a written, "uniform" procedure for every checkpoint. The court finds that the criteria used by HPD for the May 20, 2010 checkpoint were neutral as contemplated and in practice; HPD fully conformed with the requirements of *Sitz*, *Boisvert* and *Mikolinski*.

The defendant's claim is therefore without merit. For all of these reasons, his motion is DENIED.