## STATE OF CONNECTICUT *v.* OMETRIUS PEREZ
### (AC 16917)

Foti, Dranginis and Flynn, Js.

---

612

Submitted on briefs May 2—officially released August 12, 2003

*Ometrius Perez*, pro se, the appellant (defendant) filed a brief.

*Walter D. Flanagan*, state's attorney, *Judith Rossi*, executive assistant state's attorney, and *David M. Holzbach*, assistant state's attorney, filed a brief for the appellee (state).

*Opinion*

FOTI, J. The defendant, Ometrius Perez, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) and larceny in the second degree in violation of General Statutes § 53a-123.[1] On appeal, the defendant claims

[1] The defendant was charged with larceny in the first degree in violation of General Statutes §§ 53a-119 and 53a-122 (a) (1). The jury acquitted him of that charge and found him guilty of the lesser included offense of larceny in the second degree.

that (1) the trial court improperly denied his motion to suppress the statements he made while being transported from New York to Connecticut, (2) the police improperly questioned him without the presence of counsel, and the court improperly found that he knowingly, intelligently and voluntarily waived his *Miranda*[2] rights prior to being questioned, (3) the prosecutor engaged in misconduct, (4) the defendant was deprived of his right to a speedy trial, (5) his right to the effective assistance of counsel was violated when the court prohibited him from orally communicating with his attorney, (6) his fifth amendment right against double jeopardy was violated when he was convicted of burglary in the first degree and robbery in the first degree, (7) the court improperly instructed the jury and (8) there was insufficient evidence to convict him of burglary in the first degree and robbery in the first degree. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 2 a.m. on April 16, 1994, the victim, Paul Levine, was awakened from sleep when somebody turned on the ceiling light in his bedroom. Upon awakening, Levine saw the defendant holding a gun in the doorway of the bedroom. The defendant ordered Levine, at gunpoint, to keep his head down or he would kill him. The defendant then took cash and jewelry from Levine valued at between $10,800 and $10,900. Levine was then ordered to go into his bathroom and not to leave. Shortly after entering the bathroom, Levine heard the front screen door close. Levine then called 911.

The defendant subsequently was arrested in New York on May 21, 1996, and transported to Connecticut. After a jury trial, the defendant was sentenced to a total

---

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

effective term of thirty-five years imprisonment. This appeal followed.

## I

The defendant initially claims that the court improperly denied his motion to suppress the statements he made while being transported from New York to Connecticut. We disagree.

The following facts and procedural history are relevant to our resolution of that issue. An arrest warrant was issued for the defendant on April 21, 1994, for the crimes underlying this appeal. Subsequently, the defendant was arrested and incarcerated in New York for crimes occurring in that state. On October 16, 1995, the state of Connecticut sought temporary custody of the defendant through the interstate agreement on detainers (IAD).[3] A pretransfer hearing was then held in the Dutchess County Supreme Court in New York at the request of the defendant. After the hearing, that court granted the state's request for the temporary removal of the defendant to face charges in Connecticut.

On May 21, 1996, Detectives Brian Meraviglia and David Wagner of the Connecticut state police transported the defendant from the Green Haven Correctional Facility in Stormville, New York, to the Troop A state police barracks in Southbury. Prior to transporting the defendant, Wagner handcuffed the defendant and read him his *Miranda* rights. During the transportation, Wagner and the defendant engaged in a conversation. During that conversation, the defendant told Wagner that he was involved in the robbery at the victim's house. Upon arriving at Troop A, Wagner asked the defendant if he would provide a written statement about the crimes underlying this appeal. The defendant

---

[3] The IAD is codified in General Statutes § 54-186.

declined until he had the opportunity to speak with the prosecutor.

The defendant filed a motion to suppress the statements that he had made to Meraviglia and Wagner while being transported to Connecticut. A hearing was held before the court on October 24, 1996. The only two witnesses to testify at the hearing were Meraviglia and Wagner. After hearing argument from the defendant and the state, the court reserved decision on the defendant's suppression motion and asked each party to submit simultaneous briefs on what effect, if any, the defendant's representation by counsel on unrelated charges in New York had on the present matter.

Following the submission of the requested briefs and further argument from counsel, the court denied the defendant's motion to suppress in a written memorandum of decision. The court found that the defendant's right to counsel under the federal and state constitutions had not attached when the state filed the information against him because "it did not signal the commencement of adversary judicial criminal proceedings."

The defendant now appeals from the court's decision. It is the defendant's contention on appeal that his federal and state constitutional rights to counsel were violated when Wagner questioned him while being transported from New York to Connecticut. The defendant claims that adversary proceedings had commenced, and, therefore his constitutional right to counsel attached when the state filed an information in connection with the April 16, 1994 robbery and when the state later requested and obtained his temporary custody pursuant to the IAD. Specifically, the defendant claims that his statements to Wagner while being transported should have been suppressed because he was

not provided counsel before being interrogated after his right to counsel had attached.

Initially, we note that the defendant has raised his claim under the sixth amendment to the federal constitution, as well as under article first, § 8, of our state constitution. Our Supreme Court already has held that the "time of the attachment of the right to counsel [under the federal constitution] is no different under article first, § 8, of the constitution of Connecticut." *State* v. *Lewis*, 220 Conn. 602, 612, 600 A.2d 1330 (1991); *State* v. *Palmer*, 206 Conn. 40, 64, 536 A.2d 936 (1988). Therefore, because a defendant's right to counsel attaches at the same time under both the federal and state constitutions, we need not separately address the defendant's state constitutional claim.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . When a factual issue implicates a constitutional claim, however, we review the record carefully to ensure that its determination was supported by substantial evidence. . . . Nonetheless, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Young*, 76 Conn. App. 392, 407–408, 819 A.2d 884, cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003).

The defendant's claim rests on his belief that his right to counsel had attached prior to being questioned by Wagner while being transported from New York to Con-

necticut. "The sixth amendment accords the right of an accused to the assistance of counsel in all criminal prosecutions; this right attaches only at or after the time that adversary judicial proceedings have been initiated . . . . It is this point, therefore, that marks the commencement of the criminal prosecutions to which alone the explicit guarantees of the Sixth Amendment are applicable." (Citations omitted; internal quotation marks omitted.) *State* v. *Lewis*, supra, 220 Conn. 611–12.

Even if we were to agree with the defendant's claim that his rights under the sixth amendment had attached prior to speaking to Wagner, the court properly denied the defendant's motion to suppress because he did not invoke that right. See id., 612–13. This case is nearly identical to our Supreme Court's decision in *State* v. *Lewis*, supra, 220 Conn. 602. In *Lewis*, the defendant claimed that certain inculpatory statements that he made to the police should have been suppressed because they were elicited in violation of his federal and state constitutional rights. Id., 610. The defendant argued that his sixth amendment rights attached when an information was filed nearly one year before he was arrested and questioned. Relying on the United States Supreme Court's decision in *Patterson* v. *Illinois*, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988), our Supreme Court rejected the defendant's claim because there was no evidence that established that the defendant had invoked his rights under the sixth amendment. *State* v. *Lewis*, supra, 612–13.

"In *Patterson*, the United States Supreme Court held that the uncounseled postindictment statements of an accused were admissible against him despite the fact that his right to counsel had come into existence. The fact that [the defendant's] Sixth Amendment right came into existence with his indictment, i.e., that he had such a right at the time of his questioning, does not distinguish him from the preindictment interrogatee

whose right to counsel is in existence and available for his exercise while he is questioned. Had [the defendant] indicated that he wanted the assistance of counsel, the authorities' interview with him would have stopped, and further questioning would have been forbidden . . . . Because the defendant had not yet been arraigned and had adequately waived his right to counsel, as he did his *Miranda* rights, the fact that his rights to counsel *existed* would not require the suppression of his statements." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 613.

In this case, there was no evidence that the defendant invoked his rights under the sixth amendment. Wagner testified that he informed the defendant of his *Miranda* rights and that the defendant indicated that he understood those rights. At no point in the conversation did the defendant ask for an attorney or state that he wanted to stop the conversation. Therefore, regardless of whether the defendant's sixth amendment rights had attached, the defendant failed to invoke them. Accordingly, we conclude that the court properly denied the defendant's motion to suppress the statements that he made while being transported from New York to Connecticut.

## II

The defendant next claims that his fifth amendment right to remain slient was violated when the police questioned him without the presence of counsel. Alternatively, the defendant claims that the state failed to prove that his waiver of his *Miranda* rights was knowing, voluntary and intelligent. We disagree.

The following facts and procedural history are relevant to our resolution of that issue. Wagner interviewed the defendant on April 16, 1994, shortly after the robbery underlying the charges in this case. After Wagner read the defendant his *Miranda* rights and had the defendant

sign a waiver of those rights, Wagner questioned the defendant about his whereabouts on April 15 and 16, 1994.

The defendant subsequently was arrested in New York on charges arising in that state. While the defendant was incarcerated in New York, Wagner telephoned him in an attempt to interview him. Through a prison official, the defendant told Wagner that he did not want to speak with Wagner.

The state of Connecticut sought temporary custody of the defendant through the IAD in October, 1995. Following a hearing in which the defendant was represented by counsel, the court granted the state's request for temporary custody of the defendant. On May 21, 1996, Wagner and Meraviglia transported the defendant from New York to Connecticut. Prior to leaving Green Haven Correctional Facility in New York, Wagner informed the defendant of his rights pursuant to *Miranda*, and the defendant indicated to Wagner that he understood those rights. While being transported, the defendant gave statements to Wagner implicating himself in the charges underlying this appeal.

The defendant filed a motion to suppress the statements he made while being transported. The court denied the motion, finding that the defendant's *Miranda* rights were "thoroughly explained to him" and that the defendant had waived those rights.

A

As previously stated, our standard of review for a trial court's ruling on a motion to suppress is well settled. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they

find support in the facts set out in the memorandum of decision . . . . [O]ur review is plenary and we must determine whether the trial court's conclusions of law are legally and logically correct and find support in the stipulated facts." (Internal quotation marks omitted.) *State* v. *Spells*, 76 Conn. App. 67, 87, 818 A.2d 808 (2003).

The defendant does not contend that he was not read his rights pursuant to *Miranda*. Rather, it is the defendant's contention that he had invoked his right to remain silent when he refused to speak to Wagner while incarcerated in New York and when counsel at the transfer hearing represented him. Accordingly, the defendant contends, because he had invoked his right to counsel, he could not be questioned unless an attorney was present. See *Michigan* v. *Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

Although we do not disagree with the defendant's statement that once he invoked his right to counsel, he could not be questioned unless an attorney was present, our Supreme Court, as well as courts of other jurisdictions, has rejected the view that *Mosley* stands for the proposition that "the police can never reinterrogate a suspect, who has invoked his right to remain silent, regarding the same crime about which he had refused to talk." *State* v. *Stanley*, 223 Conn. 674, 693, 613 A.2d 788 (1992), and cases cited therein. Our Supreme Court in *Stanley* stated that the United States Supreme Court in *Mosley* "refused to create a per se proscription of indefinite duration upon any further questioning by any police on any subject, once the person in custody has indicated a desire to remain silent." (Internal quotation marks omitted.) Id., 694.

In *Mosley*, the United States Supreme Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off ques-

tioning was scrupulously honored." (Internal quotation marks omitted.) *Michigan* v. *Mosley*, supra, 423 U.S. 104. "The purpose of the 'scrupulously honor' test is to avoid situations where the police fail to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." (Internal quotation marks omitted.) *State* v. *Stanley*, supra, 223 Conn. 694.

In *Mosley*, the police advised the defendant of his *Miranda* rights. *Michigan* v. *Mosley*, supra, 423 U.S. 97. During the course of police questioning, the defendant stated that he no longer wanted to speak, at which time the interrogation ended. Id. Approximately two hours later, a second officer, after advising the defendant of his *Miranda* rights, began questioning the defendant. Id., 97–98. During the course of the second interrogation, the defendant made statements that he later sought to suppress. Id., 98. The United States Supreme Court affirmed the trial court's decision denying the defendant's motion to suppress, concluding that "the defendant's right to cut off questioning was fully respected because: (1) the first interrogating police officer had immediately ceased his interrogation when the defendant invoked his right to remain silent; (2) the second interrogating police officer had waited a significant period of time, more than two hours, before reinterrogating the defendant; (3) the reinterrogation concerned a crime unrelated to the first interrogation; and (4) before the second interrogation began, the defendant had been advised of his *Miranda* rights and had waived those rights." *State* v. *Stanley*, supra, 223 Conn. 692.

In *Stanley*, our Supreme Court found that the defendant's fifth amendment rights were honored when the interrogation was stopped when the defendant invoked his right to remain silent, and a five hour period of

time lapsed before he was requestioned about the same crime and advised of his *Miranda* rights before being reinterrogated. Id., 693–95.

Similarly, in this case, we conclude that the defendant's rights under the fifth amendment were honored. Wagner attempted to speak to the defendant while he was incarcerated in New York. When the defendant refused to speak to Wagner, Wagner did not pursue the attempt. A significant period of time elapsed between the time when Wagner called the defendant in prison and the time when he transported the defendant from New York to Connecticut.[4] Further, prior to initiating the conversation with the defendant while being transported to Connecticut, Wagner informed the defendant of his *Miranda* rights, and the defendant indicated that he understood those rights. Accordingly, because the defendant's fifth amendment rights were "scrupulously honored," we conclude that the court did not improperly deny the defendant's motion to suppress his statements to Wagner because the defendant had earlier invoked his right to remain silent.

## B

The defendant next claims that the state failed to prove that his waiver of his *Miranda* rights was knowing, voluntary and intelligent. It is the defendant's contention that there was no evidence that he indicated a willingness to talk. We disagree.

---

[4] There is some dispute between the record and the trial court's memorandum of decision on when Wagner attempted to call the defendant in New York. The defendant's brief and the trial court's memorandum of decision indicate that Wagner attempted to call the defendant shortly before the transfer hearing in April, 1996. Wagner's testimony at the suppression hearing, however, reveals that he attempted to call the defendant within a week after the defendant was arrested. Regardless, under either scenario, a significant period of time, more than one month, had elapsed between the time of the attempted telephone call and the time when the defendant gave the statements that he now seeks to suppress.

"[T]o show that the defendant waived his privilege against self-incrimination, the state must prove by a preponderance of the evidence that he knowingly and intelligently waived his constitutional right to remain silent. . . . The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. . . . [T]he question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . The issue of waiver is factual, but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation. . . .

"The burden upon the state to prove a valid waiver of *Miranda* rights is proof by a fair preponderance of the evidence and not proof beyond a reasonable doubt. . . . In considering the validity of this waiver, we look, as did the trial court, to the totality of the circumstances of the claimed waiver." (Citation omitted; internal quo-

tation marks omitted.) *State* v. *Wright*, 76 Conn. App. 91, 99–100, 818 A.2d 824 (2003).

At the suppression hearing, the only witnesses to testify were Wagner and Meraviglia. Wagner testified that he read the defendant his *Miranda* rights prior to transporting him to Connecticut. Wagner further testified that the defendant indicated that he understood those rights.

In denying the defendant's motion to suppress, the court, crediting the uncontested testimony of Wagner, found that the defendant knowingly and voluntarily had waived his rights pursuant to *Miranda*. The court stated that it "has had the opportunity to see [the defendant], observe him, to listen to him since he has been in this courtroom" and that it found that he was "clearly an intelligent gentleman."

After a careful review of the evidence, we uphold the court's factual findings and its conclusion that the defendant knowingly and intelligently waived his *Miranda* rights. The defendant places great significance on the fact that he did not sign or initial an acknowledgement of rights form after he was read his *Miranda* rights. Although a "defendant's express written and oral waiver is strong proof that the waiver is valid . . . the failure to sign a form or give a written statement does not necessarily indicate an involuntary waiver." (Citation omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 74 Conn. App. 580, 586, 814 A.2d 384, cert. denied, 263 Conn. 915, 821 A.2d 771 (2003).

At the time of his statement to Wagner, the defendant was twenty-five years old. The uncontested evidence before the court indicated that Wagner had informed the defendant of his *Miranda* rights and that at no point in time did the defendant attempt to invoke those rights. He never asked to speak to an attorney or to stop the conversation.

The record before us reveals that the defendant is fluent in English, the language in which he was informed of his *Miranda* rights. The defendant does not contend, nor does our review of the record indicate, that he was under the influence of any drug or alcohol at the time he gave his statement or that he suffered from any mental disease, disorder or defect.

Additionally, the defendant is not a novice to the criminal justice system. See *State* v. *Huckaby*, 47 Conn. App. 523, 528, 706 A.2d 16 (1998). When he gave his statement to Wagner, he was incarcerated in New York for having committed a robbery. He previously had been convicted of four felonies. At the defendant's second trial in New York, the first having ended in a mistrial, the defendant represented himself. Further, the defendant indicated that he knew how to invoke his right to remain silent when he refused to accept Wagner's telephone call while incarcerated in New York. See *State* v. *DaEria*, 51 Conn. App. 149, 167, 721 A.2d 539 (1998).[5]

On the basis of the totality of the circumstances, we conclude that the court properly found that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights prior to giving his statement to Wagner.

### III

The defendant next claims that the prosecutor engaged in misconduct during closing argument to the jury. Specifically, the defendant contends that the prosecutor's comments during closing argument "burdened his having exercised his constitutional right to be

---

[5] We further note that during the pretrial proceedings of this case, the defendant sought to represent himself. After a hearing, the court, *Stodolink, J.*, granted the defendant's request. During the court's canvass of the defendant, the defendant stated that he was an engineering student in college, and that he had represented himself in a prior case and had some experience with the rules of evidence.

present at his trial . . . and [his] constitutional right to testify on his own behalf."[6] We disagree.

At trial, the defendant testified. He testified that he was not involved in the robbery and that his fingerprints, which were found at the scene, were from an earlier attempt to throw "stink bombs" into the house. The defendant also admitted that he gave a false alibi to the police the day of the robbery.

During closing argument, the prosecutor stated: "Now, look at what the defendant testified to and how he testified. Was any of his testimony credible? He has four felony convictions on his record. He's sitting up here, and he has watched everything that has been testified to already. He knows what he's trapped into. He has seen how credible the state's witnesses are, so he has to come up with something that kind of puts it all together." The court then interrupted the prosecutor's argument. The prosecutor continued: "How does he testify? He admits that he made up an alibi. But then qualifies and says, well, the alibi applies to me and my friend but, not to [the defendant's girlfriend]; we just put her into it to get her out of trouble. He helps hide the gun for [his girlfriend] to get her out of trouble. . . . Then the state had a chance to start asking him some questions. Think about how he responded to the state's questions. How definitive were the answers to the questions that the state was asking you? How much sense did it all make?"

The defendant did not object to the prosecutor's argument at trial and now seeks review under *State* v. *Gold-*

---

[6] The defendant claims that his constitutional rights were violated under both the federal and state constitutions, but he has not provided a separate analysis for his state constitutional claim. Accordingly, we deem it abandoned and will not afford it review. See *State* v. *Saez*, 76 Conn. App. 502, 504 n.4, 819 A.2d 927, cert. denied, 264 Conn. 914, 826 A.2d 1158 (2003).

*ing,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[7] We review the claim because the record is adequate to do so, and an allegation of prosecutorial misconduct in violation of a fundamental right is of constitutional magnitude. *State* v. *Dubose,* 75 Conn. App. 163, 180, 815 A.2d 213, cert. denied, 263 Conn. 909, 819 A.2d 841 (2003).

"In evaluating a prosecutorial misconduct claim, we review whether the record discloses a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial. . . . A statement within closing argument is blatantly egregious as to implicate the fundamental fairness of the trial itself where 'in light of all of the facts and circumstances . . . no curative instruction could reasonably be expected to remove [its] prejudicial impact.' . . . In reviewing a claim of prosecutorial misconduct during closing argument, we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Wickes,* 72 Conn. App. 380, 385, 805 A.2d 142, cert. denied, 262 Conn. 914, 811 A.2d 1294 (2002).

The defendant principally relies on *State* v. *Cassidy,* 236 Conn. 112, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled, *State*

---

[7] Under *Golding,* a defendant can prevail on an unpreserved claim of constitutional error "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) *State* v. *Golding,* supra, 213 Conn. 239–40.

v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000), *State* v. *Shinn*, 47 Conn. App. 401, 704 A.2d 816 (1997), cert. denied, 244 Conn. 913, 914, 713 A.2d 832, 833 (1998), and *Agard* v. *Portuondo*, 117 F.3d 696 (2d Cir. 1997), rev'd, 529 U.S. 61, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000), for his claim that the prosecutor's comments denied him a fair trial. His reliance, however, is misplaced. The cases that the defendant relies on no longer are good law. *Agard* was reversed by the United States Supreme Court in *Portuondo* v. *Agard*, 529 U.S. 61, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000). Our Supreme Court, in *State* v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000), relying on the United States Supreme Court's decision in *Portuondo*, overruled *Cassidy*, which we relied on in *Shinn*. Accordingly, *Portuondo* and *Alexander* govern our resolution of the defendant's claim.

In *Portuondo* v. *Agard*, supra, 529 U.S. 62, the United States Supreme Court squarely addressed the issue before us today, that is, whether it is consistent with due process for a prosecutor, during summation, to call the jury's attention to the fact that the defendant had the opportunity to hear all the other witnesses testify and had the ability to tailor his testimony accordingly. The court stated that "it is natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to have in mind and weigh in the balance the fact that he heard the testimony of all those who preceded him." Id., 67–68. In concluding that the comments were proper, the court held: "Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and indeed, given the inability to sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth." Id., 73. Similarly, in *State* v. *Alexander*, supra, 254 Conn. 299–300, our Supreme Court concluded that a prosecutor's comments during closing

argument were not improper when he stated that the defendant had the opportunity to observe the testimony of all the witnesses, consequently enabling him to tailor his testimony.

In this case, the prosecutor's comments did not urge the jury to conclude that the defendant was guilty "solely based on [his] exercise of his constitutional right to be present at trial and confront the witness." Id., 299. On the contrary, the comments were directed at the defendant's credibility and supported by the evidence adduced at trial.

Accordingly, the defendant has failed to establish that a constitutional violation clearly existed that clearly deprived him of a fair trial. Our Supreme Court has held that a prosecutor's comments during closing argument on the "defendant's presence at trial and his accompanying opportunity to fabricate or tailor his testimony"; id., 300; do not violate federal constitutional standards. Therefore, the defendant has failed to meet prong three of *Golding* review.

## IV

The defendant next claims that his constitutional right to due process and his statutory rights under the IAD were violated because the court did not dismiss the charges against him when he was not tried within the 120 day time period specified in the IAD.[8] We disagree.

The following facts and procedural history are relevant to our resolution of that issue. Following a hearing in New York, the defendant was transferred to Connecticut pursuant to the IAD on May 21, 1996. On September

---

[8] The defendant's brief addresses his claim only in relation to the alleged violation of his statutory rights. Because he has not addressed his constitutional claims, we deem them abandoned. See *State* v. *Rivera*, 74 Conn. App. 129, 135 n.6, 810 A.2d 824 (2002).

20, 1996, the defendant sought dismissal of the charges, claiming that his trial had not commenced within 120 days of his arrival in Connecticut. At the hearing, the defendant argued that the statutory time limit expired on September 18, 1996. The state then argued that as a result of the defendant's requests for continuances, the time limit was not to expire for another six weeks. The defendant agreed with the state's representation to the court that his attorneys had asked for the continuances; however, he stated that he did not agree with the continuances. The court, *Stodolink, J.*, rejected the defendant's argument, finding that the 120 day period did not expire because it was tolled for a total of six weeks and one day since his arrival in Connecticut on May 21, 1996.

The defendant now appeals from the court's denial of his motion to dismiss the charges. Specifically, the defendant contends that the court improperly concluded that the statutory 120 day time period was tolled when his attorneys sought continuances after he was transported to Connecticut.

"The IAD is a congressionally sanctioned interstate compact the interpretation of which presents a question of federal law. . . . Our standard of review of the [defendant's] claim is plenary. We must decide whether the court's conclusion is legally and logically correct and find[s] support in the facts that appear in the record. . . .

"The purpose of the IAD is to establish a cooperative procedure for disposition of charges against a prisoner in one state who is wanted to respond to untried criminal charges in another state. . . . The IAD is activated when the state seeking the prisoner (the receiving state) files written notice that he is wanted to answer charges in that state. . . . This notice, referred to as a detainer, is simply a notification filed with the institution in which

the prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." (Citations omitted; internal quotation marks omitted.) *State* v. *Taylor*, 63 Conn. App. 386, 411–12, 776 A.2d 1154, cert. denied, 257 Conn. 907, 777 A.2d 687, cert. denied, 534 U.S. 978, 122 S. Ct. 406, 151 L. Ed. 2d 308 (2001).

Article IV (c) in the IAD provides that the "trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." General Statutes § 54-186, art. IV (c). "[I]n the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in article . . . IV . . . the appropriate court of the jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect." General Statutes § 54-186, art. V (c).

The defendant relies primarily on *State* v. *Anonymous (1980-6)*, 36 Conn. Sup. 327, 419 A.2d 904 (1980). The defendant's reliance is misplaced. As an initial matter, the defendant incorrectly states that *Anonymous (1980-6)* was a decision rendered by our Supreme Court. The case, however, is a decision by a trial court by which we are not bound. See *McDonald* v. *Rowe*, 43 Conn. App. 39, 43, 682 A.2d 542 (1996). Regardless, *Anonymous (1980-6)* is distinguishable from the present case. The defendant relies on language in *Anonymous (1980-6)* that states: "The defendant should not be precluded from making motions for discovery while the time period runs. He cannot know at the time of filing whether the state will proceed to trial in a timely

fashion but must assume that his preparation is essential in case the state does proceed." *State* v. *Anonymous (1980-6)*, supra, 332. In *Anonymous (1980-6)*, however, the court specifically noted that there were no continuances in the record to toll the time period. Id., 333. Rather, the court was faced only with the decision of whether the filing of a discovery motion tolled the statutory time period, not, as is the case here, whether the seeking of a continuance by a defendant's attorney tolls the time period.

"Because the IAD . . . has been deemed to constitute federal law . . . interpretations of its provisions by the federal courts have special significance." (Internal quotation marks omitted.) *Pinto* v. *Commissioner of Correction*, 62 Conn. App. 24, 30, 768 A.2d 456, cert. denied, 256 Conn. 906, 772 A.2d 596 (2001). The time limit established under the IAD may be tolled by virtue of delays attributable to the defendant. *United States* v. *Paredes-Batista*, 140 F.3d 367, 372 (2d Cir.), cert. denied, 525 U.S. 859, 119 S. Ct. 143, 142 L. Ed. 2d 116 (1998). "Thus, in computing whether or not the requirements of Article IV (c) have been satisfied, it is appropriate to exclude all those periods of delay occasioned by the defendant." *United States* v. *Scheer*, 729 F.2d 164, 168 (2d Cir. 1984).

The record before us clearly reveals that the defendant, through his attorney, asked for continuances on two occasions. On June 4, 1996, attorney Miles Gerety represented the defendant. Gerety entered a not guilty plea on behalf of the defendant and then sought a three week continuance to "get an open file." On June 26, 1996, attorney Vicki H. Hutchinson, who was appointed the prior day, represented the defendant. Hutchinson indicated to the court that she had not had the opportunity to speak to the defendant or to review any of the evidence possessed by the state. Hutchinson then

requested a continuance until July 23, 1996.[9] In total, the record reveals that the defendant, through his attorney, requested and was granted a continuance for a total of seven weeks.[10]

The defendant was transported to Connecticut on May 21, 1996, pursuant to the IAD, thus beginning the start of the 120 day time period established by article IV (c) of the IAD. Without any tolling of the time period, the defendant's trial would have had to commence on or before September 18, 1996. The record, however, clearly reveals that the defendant had asked for and was granted continuances totaling seven weeks, which tolled the statutory time period. Therefore, the required time in which the defendant's trial must have commenced was extended by seven weeks to November 6, 1996. Jury selection in the defendant's trial began on October 16, 1996, and the jury was sworn in on October 24, 1996, within the statutory time period established by the IAD. Accordingly, the court's conclusion that the defendant's trial was timely was legally and logically correct, finding support in the facts that appear in the record.

V

The defendant next claims that the court's prohibition of oral communication between himself and his attorney denied him his sixth amendment right to the assistance of counsel.[11] Specifically, the defendant's claim

---

[9] The court also based its decision that the 120 day time period had not expired on a one day continuance that was granted to Hutchinson on June 25, 1996. The transcript from that proceeding, however, has not been provided to us. Therefore, we do not consider it in our decision.

[10] We note that the court's decision and the state's brief state that the total continuance time, excluding the one day continuance for which we do not have the transcript, was six weeks. It is unclear from the record how the court and the state calculated the time from June 4 to July 23, 1996, to be six weeks as opposed to seven weeks.

[11] The defendant also claims that he was denied the effective assistance of counsel. We decline to review that aspect of the defendant's claim because the defendant has provided no legal analysis for his claim. "Analysis, rather

is based on the court's restriction of his ability to speak to his attorney while his attorney was questioning witnesses during the suppression hearing.

"When a claim is raised for the first time on appeal, our review of the claim is limited to review under either the plain error doctrine or *State* v. *Golding*, [supra, 213 Conn. 239–40]. The defendant did not request review of his claim under either of those doctrines. As this court has previously noted, it is not appropriate to engage in a level of review that is not requested." (Citation omitted; internal quotation marks omitted.) *State* v. *Constantopolous*, 68 Conn. App. 879, 883, 793 A.2d 278, cert. denied, 260 Conn. 927, 798 A.2d 971 (2002). Accordingly, we decline to review the defendant's claim.[12]

## VI

The defendant next claims that the court's instructions to the jury were inadequate and misleading,

---

than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Sinvil*, 76 Conn. App. 761, 765 n.4, 821 A.2d 813, cert. granted on other grounds, 264 Conn. 916, 826 A.2d 1160 (2003). Furthermore, claims of ineffective assistance of counsel have been required to be raised by way of habeas corpus, rather than direct appeal "because of the need for a full evidentiary record for such [a] claim." (Internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 688, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

[12] Even if we were to review the defendant's claim, it would fail. The court, after noticing that the defendant had tried to speak to his attorney after every question he asked, informed the defendant that he was no longer to interrupt his attorney's questioning of the witness. The court gave the defendant a pad and pen to write down anything he would like to speak to his attorney about and stated that he would give the defendant an opportunity to talk to his attorney after questioning each witness. The court did not prohibit the defendant from speaking to his attorney. Rather, the court only restricted the defendant from speaking to his attorney after every question. "[T]he Sixth Amendment right to counsel does not permit unfettered communication between the accused and his lawyer during trial proceedings." *Jones* v. *Vacco*, 126 F.3d 408, 415–16 (2d Cir. 1997). Accordingly, because the court did not prohibit the defendant from speaking to his attorney, but placed only a reasonable restriction on when that communication could take place, the defendant's right to counsel was not violated.

thereby denying him due process of law and a fair trial. We disagree.

The defendant raises three points of contention with the court's instruction to the jury. He claims that (1) the instructions for burglary in the first degree inadequately defined the terms "building" and "dwelling," (2) the court instructed the jury on burglary in the second degree with a firearm, as opposed to burglary in the second degree, and (3) the court failed to instruct the jury that it must acquit him if the state did not prove all of the essential elements of the crimes with proof beyond a reasonable doubt.

"The standard of review for constitutional claims of improper jury instructions is well settled. In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Hall*, 66 Conn. App. 740, 748–49, 786 A.2d 466 (2001), cert. denied, 259 Conn. 906, 789 A.2d 996 (2002).

## A

The defendant first claims that the court's jury instructions on burglary in the first degree inadequately defined the terms "building" and "dwelling." The court

instructed the jury as follows: "Now, burglary is an intrusionary offense and the intrusion must be in a building. Ordinarily, a building implies that a structure may be entered and used by human beings as a dwelling or business or for other persons involved, occupancy by people whether or not so actually entered or used. Our law has expanded a step to include other things, but for our purposes today, we can consider a house a building, if you find this occurred in Mr. Levine's dwelling. That does suffice certainly as a building within the meaning of the statute and the first element of this particular charge."

The defendant does not indicate, however, how the instructions were inadequate. "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Sinvil*, 76 Conn. App. 761, 765 n.4, 821 A.2d 813 (2003).

Regardless, the court's instruction to the jury was proper. General Statutes § 53a-100 (a) defines a building, in relevant part, as having "its ordinary meaning." A "building," according to Black's Law Dictionary, is a "[s]tructure designed for habitation, shelter, storage, trade, manufacture, religion, business, education, and the like." Black's Law Dictionary (6th Ed. 1990). It is clear that the court's charge, read as a whole, did not mislead the jury and was a proper statement of the law.

B

The defendant next claims that the court improperly instructed the jury by charging on burglary in the second degree with a firearm as opposed to burglary in the second degree. The defendant also claims that the charge improperly altered the state's burden of proof. We disagree.

Initially, the defendant's claim that the court improperly instructed the jury on burglary in the second degree with a firearm, as opposed to burglary in the second degree, is without merit. In his request to charge the jury, the defendant sought to have the court instruct the jury on burglary in the second degree with a firearm in violation of General Statutes § 53a-102a, which is precisely the charge that the court provided. The defendant never requested that the court instruct the jury on burglary in the second degree in violation of General Statutes § 53a-102.

The defendant also claims that the following language altered the state's burden of proof: "For burglary in the second degree, a person must be charged with utilizing a firearm in the perpetration of that crime, and the definition of it is that burglary in the second degree with a firearm occurs when someone commits it in the second degree, as provided by the statute, in the commission of such offense he uses or is armed with or threatens to use or displays or has represented by his words or conduct that he possesses a pistol, rifle, shotgun, machine gun or other firearm.

"In order to find him guilty of this, you must find that he represented by his words or conduct that he had such a weapon. So, all we can say here, ladies and gentlemen, is if you don't believe that this is a weapon, or that a weapon was used, then you're going to larceny—or rather to burglary in the second degree to determine whether or not whatever the person had in the commission of this particular crime was represented as being a weapon. And if you so find, again . . . the elements of the burglary, if you find not that a real weapon was used, but something representative to be a weapon, then you would find burglary in the second degree. If you find indeed that it was a dangerous and deadly weapon, a real weapon, you will not consider burglary in the second degree. And again, you

must find the other elements present in order to find someone guilty of burglary in the first degree. If not, then you go to burglary in the second degree and, again, the same elements must be established. Instead of it being a deadly weapon, it is represented as a deadly weapon or a dangerous instrument. In this case, we're talking about a weapon, not a dangerous instrument."

The defendant incorrectly claims in his supplemental brief that the court's charge deprived him of his "due process rights to be convicted of a lesser offense." Once again, the defendant does not state how the court's charge was improper. A reading of the charge in its entirety, however, reveals that it was not reasonably possible that the court's instructions misled the jury or that the instructions were legally deficient.

### C

The defendant's final claim of improper jury instructions is that the court improperly failed to instruct the jury that to convict him of the charges against him, the state had to prove each essential element of the charges beyond a reasonable doubt. The defendant's claim is without basis in the record. The court specifically instructed the jury that to find the defendant guilty, it must find that the state had proved each of the essential elements beyond a reasonable doubt. Accordingly, reading the jury charge as a whole, we conclude that it was correct in law and provided sufficient guidance to the jury.

### VII

The defendant next claims that his fifth amendment right against double jeopardy was violated when the court sentenced him for both burglary in the first degree in violation of § 53a-101 and robbery in the first degree in violation of § 53a-134. We disagree.

The defendant did not preserve his claim in the trial court and asks this court to review it pursuant to *State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 (1973), our precursor to *State* v. *Golding*, supra, 213 Conn. 233.[13] Because the record is adequate for review and claims of double jeopardy are constitutional in nature, we will review the defendant's claim. See *State* v. *William B.*, 76 Conn. App. 730, 759–60, 822 A.2d 265, cert. denied, 264 Conn. 918, 828 A.2d 618 (2003). We conclude, however, that a constitutional violation did not clearly exist and that the defendant was not deprived of a fair trial.

"We begin by noting that, because this claim presents an issue of law, our review is plenary." *State* v. *Butler*, 262 Conn. 167, 174, 810 A.2d 791 (2002). "The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . This constitutional provision is applicable to the states through the due process clause of the fourteenth amendment. . . . The Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy. . . . This constitutional guarantee . . . protects against multiple punishments for the same offense [in a single trial]. . . .

"In the context of a single trial, the double jeopardy analysis is a two part process. . . . First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. . . . [T]he role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense. . . . The issue, though essentially constitutional, becomes one of statutory construction." (Cita-

---

[13] See footnote 7.

tions omitted; internal quotation marks omitted.) *State v. McColl*, 74 Conn. App. 545, 566–67, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003).

It is not disputed that the defendant's conviction of robbery in the first degree and burglary in the first degree arose out of the same act or transaction. Therefore, we direct our inquiry at whether the charged crimes are the same offense.

"The traditional test for determining whether two offenses are the same offense for double jeopardy purposes was set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Porter*, 76 Conn. App. 477, 484, 819 A.2d 909, cert. denied, 264 Conn. 910, 826 A.2d 181 (2003).

To convict the defendant of burglary in the first degree, the state had to prove that he unlawfully entered or remained in a building "with [the] intent to commit a crime therein" while "(1) . . . armed with . . . a deadly weapon or dangerous instrument . . . ." General Statutes § 53a-101 (a). To convict the defendant of robbery in the first degree, the state had to prove that in the course of committing a larceny, he used or threatened the immediate use of physical force on another person to compel the owner of property to deliver up the property while the defendant was armed with a deadly weapon. General Statutes §§ 53a-133 and 53a-134. The long form information with which the defendant was charged, with respect to the charges of rob-

bery in the first degree and burglary in the first degree, essentially mirrored the language of the statutes. "It is apparent by comparison of the statute and information on each charge that each offense requires proof of elements that the other does not." *State* v. *Kirsch*, 263 Conn. 390, 421, 820 A.2d 236 (2003). Accordingly, it was possible to prove one offense in the manner charged in the information without necessarily proving the other offense.

Our Supreme Court, in *State* v. *Kirsch*, supra, 263 Conn. 390, in analyzing a defendant's claim, on double jeopardy grounds, that he could not be convicted of both manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3) and manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b, stated: "Our analysis of double jeopardy claims does not end, however, with a comparison of the offenses. The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning [legislative] purpose the rule should not be controlling where . . . there is a clear indication of contrary legislative intent." (Internal quotation marks omitted.) *State* v. *Kirsch*, supra, 421–22.

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Thus, this process requires us to consider all relevant sources of the meaning of the language at issue,

without having to cross any threshold or thresholds of ambiguity. . . .

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered." (Internal quotation marks omitted.) *State* v. *Stewart*, 77 Conn. App. 393, 396, 823 A.2d 392 (2003). As previously stated, the clear language of the statutes does not indicate an express intent by our legislature that a person convicted of robbery in the first degree could not also be convicted of burglary in the first degree for the same act. "By contrast, however, our Penal Code is replete with other statutes in which the legislature expressly has barred conviction of two crimes for one action. See, e.g., General Statutes § 53a-55a (a) ('[n]o person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction'); General Statutes § 53a-59a (b) ('[n]o person shall be found guilty of assault in the first degree and assault of an elderly, blind, disabled, pregnant or mentally retarded person in the first degree upon the same incident of assault'); General Statutes § 53a-59b (b) ('[n]o person shall be found guilty of assault in the first degree and assault of an employee of the Department of Correction in the first degree upon the same incident of assault'); General Statutes § 53a-72b (a) ('[n]o person shall be convicted of sexual assault in the third degree and sexual assault in the third degree with a firearm upon the same transaction'); General Statutes § 53a-92a (a) ('[n]o person shall be convicted of kidnapping in the first degree and kidnapping in the first degree with a firearm upon the same transaction')." *State* v. *Kirsch*, supra, 263 Conn. 418–19. In view of that common practice, we ordinarily presume that the legislature's failure to include such terms in §§ 53a-134 or 53a-101 indicates that it did not intend a similar result.

Furthermore, nothing in the legislative history surrounding the enactment of §§ 53a-134 or 53a-101 reveals that our legislature intended a different conclusion. There was no discussion by our legislature on whether convictions for burglary in the first degree and robbery in the first degree would be permissible or impermissible. See id., 420. "Therefore, we are left with silence on the issue, from which we do not determine legislative intent." Id. There is nothing in the language of the statutes or the legislative history that indicates that our legislature intended that an individual could not be convicted of both robbery in the first degree and burglary in the first degree for conduct that arose out of the same act or transaction.

Therefore, the offenses in this case were not the same offense for double jeopardy purposes. Accordingly, the defendant's right against double jeopardy was not violated.

## VIII

The defendant's final claim is that there was insufficient evidence before the jury to sustain his conviction of burglary in the first degree and robbery in the first degree. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Ward*, 76 Conn. App. 779, 796, 821 A.2d 822, cert. denied, 264 Conn. 918, 826 A.2d 1160 (2003).

## A

The defendant claims that there was insufficient evidence to sustain his conviction of burglary in the first

degree because the state failed to prove all the essential elements of that offense. Specifically, the defendant claims in his supplemental brief that the state did not prove that "the building in question [was] other than a dwelling." We disagree.

The defendant was convicted of burglary in the first degree in violation of § 53a-101 (a) (1). Section 53a-101 (a) provides in relevant part that a "person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (1) [h]e is armed with . . . a deadly weapon or dangerous instrument . . . ." General Statutes § 53a-100 (a) (1) defines a building as, "*in addition to its ordinary meaning*, [to include] any watercraft, aircraft, trailer, sleeping car, railroad car or other structure or vehicle or any building with a valid certificate of occupancy. . . ." (Emphasis added.)

There is nothing in the language of the statutory definition of the term "building" that supports the defendant's contention that our legislature intended to exclude a dwelling from the definition of a building. The language of the statute clearly provides that in addition to other structures, the definition of a building includes "its ordinary meaning . . . ." General Statutes § 53a-100 (a) (1). "It is appropriate for us to look at dictionary definitions in order to clarify the ordinary meaning of various terms. . . . Building has been defined as a '[s]*tructure designed for habitation,* shelter, storage, trade, manufacture, religion, business, education, and the like. A structure or edifice inclosing a space within its walls, and usually, but not necessarily, covered with a roof.' Black's Law Dictionary [supra]. Building has also been defined as '*a usu*[*ally*] *roofed and walled structure built for permanent use (as for a dwelling).*' Merriam-Webster's Collegiate Dictionary (10th Ed. 1993). Structure has been defined as '[a]ny construction, or any production or piece of work artifi-

cially built up or composed of parts joined together in some definite manner. That which is built or constructed. . . .' Black's Law Dictionary [supra]. A structure has also been defined as 'something (as a building) that is constructed.' Merriam-Webster's Collegiate Dictionary [supra]." (Citations omitted; emphasis added.) *State* v. *Domian*, 35 Conn. App. 714, 724–25, 646 A.2d 940 (1994), aff'd, 235 Conn. 679, 668 A.2d 1333 (1996).

Furthermore, there is nothing in the legislative history surrounding the enactment of the burglary statutes that supports the defendant's definition. "Therefore, we are left with silence on the issue, from which we do not determine legislative intent." *State* v. *Kirsch*, supra, 263 Conn. 420. Accordingly, there is no support for the defendant's construction of the definition "building."

It is undisputed that the burglary in this case occurred at the victim's residence. Under the ordinary definition of a "building," one's home is clearly a building. Accordingly, there was sufficient evidence before the jury for it to find that the state had established that the burglary occurred in a building.

B

The defendant, in a one sentence footnote in his supplemental brief, also claims that there was insufficient evidence to support his conviction of robbery in the first degree. The defendant, however, does not provide any legal analysis in support of his claim.[14] As previously

---

[14] In his reply brief, the defendant again raises his claim that there was insufficient evidence presented at trial to sustain his conviction of robbery in the first degree. The defendant attempts to develop his claim for the first time in the reply brief. "[I]t is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *State* v. *Edward B.*, 72 Conn. App. 282, 302 n.12, 806 A.2d 64, cert. denied, 262 Conn. 910, 810 A.2d 276 (2002).

Regardless, on the basis of the evidence and the reasonable inferences drawn therefrom, we conclude that there was sufficient evidence for the jury to convict the defendant of robbery in the first degree. The defendant was convicted of robbery in the first degree in violation of General Statutes § 53a-134 (a), which provides in relevant part: "A person is guilty of robbery

stated, "[w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . We will not review claims absent law and analysis." (Internal quotation marks omitted.) *State* v. *Dubose,* supra, 75 Conn. App. 173 n.7.

The judgment is affirmed.

In this opinion the other judges concurred.

in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 . . . he . . . (2) is armed with a deadly weapon . . . ." General Statutes § 53a-133 provides in relevant part that a person commits robbery "when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of . . . (2) compelling the owner of such property . . . to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-119 defines a larceny as "when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

From the evidence adduced at trial, the jury reasonably could have found that at approximately 2 a.m. on April 16, 1994, the victim's daughter, the defendant's girlfriend, drove the defendant to the victim's house. The defendant told the victim's daughter to turn off the car's engine and lights. The defendant then exited the vehicle and went to the rear of the victim's house, which he entered through a window in the laundry room. The defendant awoke the victim when he turned on the ceiling light in the victim's bedroom. The defendant wanted to know where the victim kept his cash and jewelry. The defendant then pointed a gun at the victim's head and ordered him "not to look up or I'll f*cking kill you." The victim gave the defendant approximately $350 in cash and his wedding ring. The defendant then ordered the victim to show him where the other valuables were. The victim complied

with the defendant's request. From that evidence, the jury reasonably could have found the defendant guilty of robbery in the first degree.